TRINA A. HIGGINS, United States Attorney (#7349)
VERNON G. STEJSKAL, Assistant United States Attorney (#8434)
Attorneys for the United States of America
111 South Main Street, Suite 1800
Salt Lake City, Utah, 84111
Telephone: (801) 524-5682

---

# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF UTAH

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES FOR THE SEARCH OF:<br><br>Silver Sky Devices cell phone, WVPD case number WV24-7269, Evidence Tag #WV23395-1, and<br><br>Blue TCL cell phone, WVPD case number WV24-7269, Evidence Tag #WV23395-2. | Case No. 2:24mj100-DAO<br><br>AFFIDAVIT<br><br>Magistrate Judge Daphne Oberg |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

I, Task Force Officer Michael Botelho, being duly sworn, hereby depose and state as follows:

### INTRODUCTION AND OFFICER BACKGROUND

1. I make this affidavit in support on an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—two cell phones—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

1

2.  I am a detective with the West Valley City Police Department (WVPD) and I am currently assigned to the Street Crimes Unit. I have been a certified police officer in the state of Utah and have been employed with WVPD since July 2019. As a WVPD officer and detective, I have investigated cases involving violent crime, firearms, narcotics, and fugitive apprehension. I am currently a Task Force Officer (TFO) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), where I am tasked with investigating federal offenses involving firearms and narcotics. I have been assigned as such since March 2023. Further, I have testified in judicial proceedings in both state and federal courts involving prosecutions relating to violations of state and federal firearms and controlled substances laws.

3.  The statements in this affidavit do not contain all known information but rather only those facts believed necessary to establish probable cause for the requested search warrants. I am familiar with the facts and circumstances set forth herein as a result of a review of official reports and records, conversations with other law enforcement officers, and my own training, experience, and investigative efforts, as more fully described below.

### IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.  The property to be searched is as follows (hereinafter "Devices"):

    - Silver Sky Devices cell phone, WVPD case number WV24-7269, Evidence Tag #WV23395-1

    - Blue TCL cell phone, WVPD case number WV24-7269, Evidence Tag #WV23395-2

These devices are currently located at the West Valley City Police Department evidence vault, located at 3577 South Market Street, West Valley City, Utah 84119.

5.      The applied-for warrant would authorize the forensic examination of these Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## BACKGROUND REGARDING NARCOTICS DISTRIBUTION

6.      As a detective with the WVPD Street Crimes Unit and ATF Task Force Officer, I have participated in investigations involving the unlawful distribution of controlled substances, which is a violation of 21 U.S.C § 841(a)(1), and the attempt and conspiracy of the distribution of controlled substances, which is a violation of 21 U.S.C § 846. In the course of my employment with WVPD and as a Task Force Officer with ATF, I have attended numerous schools, training, and conferences related to drug investigations. In addition to my training, I have participated in numerous drug investigations, and, as such, I have experience with the methods used in conducting drug trafficking investigations, including, but not limited to, debriefing cooperating witnesses and confidential sources, conducted controlled purchases of drugs using confidential sources, engaging in undercover operations, surveillance, the preparation of affidavits, the execution of search warrants, and court orders, and making arrests. As a result of my training and experience, I am familiar with the methods used by drug traffickers to smuggle, safeguard, store, transport, and distribute controlled substances, and to collect, conceal, and transport the financial proceeds that result from such activities.

3

7. I have participated in numerous investigations in which drug traffickers relied heavily upon telephones to communicate with their associates, confidential informants, cooperating individuals, and undercover officers. I have also interviewed individuals who have been directly and indirectly involved in the importation, transportation, and distribution of illegal drugs and controlled substances; and I have worked and consulted numerous law enforcement officers experienced in drug investigations. As a result, I am familiar with how drug traffickers speak to each other and generally conduct business. For example, I am aware that drug traffickers discussing criminal matters over the phone or electronic messaging often speak vaguely, or in code. This training and experience form the basis for the opinions expressed below.

**PROBABLE CAUSE**

8. I, along with members of the Federal Bureau of Investigation Safe Streets Violent Crimes Task Force (FBI SSVCTF) (collectively "Agents"), have been investigating JESSICA LYNN JACOBS (4/28/1976) since November of 2023. The investigation began with information from Confidential Source 1 ("CS1") that CS1 was able to place orders for methamphetamine from JACOBS who was using the telephone number (801) 819-0231 with International Mobile Equipment Identifier (IMEI) 352391980042250. This information was corroborated and expanded through multiple controlled methamphetamine evidence purchases, surveillance, search warrants, phone record analysis, and communication with other law enforcement agencies.

9. On November 17, 2023, agents conducted a controlled evidence purchase of methamphetamine from JACOBS using CS1 and an undercover officer ("UCO1").

4

CS1 and UCO1 conducted the purchase for the methamphetamine at JACOBS residence, which was located at 539 North Bright Court in Salt Lake City. Inside of JACOBS residence, JACOBS sold CS1 and UCO1 approximately 118 grams of methamphetamine for $800. The suspected methamphetamine was transported to the WVPD. The suspected methamphetamine field tested positive for methamphetamine and weighed 118.9 grams. The methamphetamine was photographed and booked into evidence.

10.     On November 24, 2023, UCO1 arranged a controlled evidence purchase of methamphetamine from JACOBS. JACOBS gave UCO1 a meet location located at 3422 South Decker Lake Drive in West Valley City. Here, JACOBS sold UCO1 approximately six ounces of methamphetamine for $1,200. The suspected methamphetamine was transported to the WVPD. The suspected methamphetamine field tested positive for methamphetamine and weighed 163.5 grams. The methamphetamine was photographed and booked into evidence.

11.     On December 5, 2023, UCO1 arranged a controlled evidence purchase of methamphetamine from JACOBS. JACOBS told UCO1 to meet her at the Super 8 Hotel located at 223 Jimmy Doolittle Road in Salt Lake City. Here, JACOBS sold UCO1 a clear plastic bag of methamphetamine for $800. The suspected methamphetamine was transported to the WVPD. The suspected methamphetamine field tested positive for methamphetamine and weighed 112.1 grams. The methamphetamine was photographed and booked into evidence.

12.     On December 22, 2023, UCO1 arranged a controlled evidence purchase of methamphetamine from JACOBS. JACOBS instructed UCO1 to meet at her residence

5

located at 539 North Bright Court in Salt Lake City. Here, JACOBS sold UCO1 four ounces of methamphetamine for $800. The suspected methamphetamine was transported to the WVPD. The suspected methamphetamine field tested positive for methamphetamine and weighed 113.9 grams. The methamphetamine was photographed and booked into evidence.

13. On January 12, 2024, UCO1 arranged a controlled evidence purchase of methamphetamine from JACOBS. JACOBS gave UCO1 the meet location of the area of 200 North 200 West in Salt Lake City. This location was confirmed to be the Wendell Apartments. Here, JACOBS sold UCO1 four ounces of methamphetamine for $800. The suspected methamphetamine was transported to the WVPD. The suspected methamphetamine field tested positive for methamphetamine and weighed 117.6 grams. The methamphetamine was photographed and booked into evidence.

14. On January 18, 2024, officers with the Salt Lake City Police Department (SLCPD) located a vehicle that had previously been reported stolen. With assistance from the Utah Department of Public Safety Aero Bureau, officers were able to track the vehicle to the area of Eccles Avenue and Woodbine Street in Salt Lake City. Multiple individuals exited the vehicle, including a female who was subsequently identified as JACOBS. JACOBS began running when officers attempted to make contact with her. As JACOBS was running, she turned and pointed a small handgun at one of the pursuing officers. JACOBS eventually fell to the ground and struggled with officers as they took her into custody.

15. A Ruger LCP .380 caliber semi-automatic pistol was recovered near JACOBS. The firearm contained a loaded magazine, and a round of .380 caliber ammunition was subsequently located on JACOBS' person. Approximately 200 pills were also located in a backpack JACOBS had been carrying. The pills were blue in color and bore "M30" markings. Based on my training and experience, I know such pills commonly contain N-phenyl-N-[1-( 2-phenylethyl )-4-piperidinyl] propenamide ("Fentanyl"), which is a Schedule II controlled substance.

16. Post-*Miranda*, JACOBS confirmed she had pulled the firearm out from her shirt while running. JACOBS also stated she had obtained the firearm from a neighbor and was carrying it because the streets were dangerous. JACOBS initially denied knowledge of the pills. However, one of the blue "M30" pills was located in her pocket. JACOBS later stated the pills belonged to another individual, but she was going to sell them to obtain money.

17. On January 26, 2024, ATF Task Force Officer Randi Thomas obtained a federal arrest warrant for JACOBS for JACOBS involvement in the SLCPD case on January 18, 2024. The federal arrest warrant for JACOBS was for felon in possession of a firearm, which is a violation of 18 U.S.C § 922(g)(1).

18. On January 27, 2024, I obtained information that JACOBS was staying at the Metropolitan Inn Hotel located at 524 South West Temple Street in Salt Lake City. I, along with detectives from the SLCPD, conducted surveillance in the area. I observed JACOBS walking on foot in the hotel parking lot, and she was observed entering room 221. I confirmed with hotel management JACOBS had booked room 221 with her Utah

7

driver's license. JACOBS was subsequently observed getting into a rideshare service while wearing a backpack, and agents conducted mobile surveillance on that vehicle. A traffic stop was conducted at a gas station located at 25 North Redwood in Salt Lake City. JACOBS was pulled out of the back seat of the vehicle and taken into custody. A silver Sky Devices cell phone, further described in attachment A1, was found on JACOBS's person, in addition to a Sig Sauer P365 9mm semi-automatic caliber pistol, concealed in JACOBS's bra. That pistol was reported stolen and listed on the National Crime Information Center.

19.    Inside JACOBS' backpack, there was a blue TCL cell phone, further described in attachment A2, 329 grams of methamphetamine and 17 grams of cocaine. Both substances field tested positive. Post-*Miranda* JACOBS admitted to knowingly being a convicted felon in possession of a firearm due to the streets being dangerous, as she was in debt to four different drug dealers for approximately four pounds of methamphetamine valued at approximately $10,000. JACOBS also admitted she was selling the methamphetamine and cocaine found in her backpack. I asked JACOBS how she arranges her pickups and drop-offs for those drugs, and she told me it was all through her two phones, which are both devices listed in this affidavit. Both phones were seized and remain in secure law enforcement custody.

## TECHNICAL TERMS

20.    Based on my training and experience, I use the following technical terms to convey the following meanings:

      a.      Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device

      b.    Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.

This storage media can contain any digital data, including data unrelated to photographs or videos.

   c. Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

   d. GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer

10

connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

  e. PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

  f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have

11

static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    g.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

  21. Based on my training, experience, and research, I know that the Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS, and/or PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## **ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

  22. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

  23. *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and

12

when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

13

24. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

25. *Manner of execution.* Because this warrant seeks only permission to examine Devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

/

/

/

/

/

/

/

/

/

/

## CONCLUSION

27.    I submit this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachments in A1 and A2 to seek the items described in Attachment B.

DATED this 2nd day of February, 2024.

_____
Michael Botelho
ATF Task Force Officer

SUBSCRIBED and SWORN BEFORE ME:

_____
DAPHNE OBERG
United States Magistrate Judge

## ATTACHMENT A1
**Property to be Searched**

The property to be searched is as follows:

- Silver Sky Devices cell phone, WVPD case number WV24-7269, Evidence Tag #WV23395-1

This device is currently located at the WVPD evidence vault located at 3577 South Market Street, West Valley City, Utah 84119.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT A2
**Property to be Searched**

The property to be searched is as follows:

- Blue TCL cell phone, WVPD case number WV27-7269, Evidence Tag #WV23395-2

This device is currently located at the WVPD evidence vault located at 3577 South Market Street, West Valley City, Utah 84119.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B
### Evidence to be Seized

1. All records on the Devices described in Attachment A1 and A2 that relate to violations of Title 21 U.S.C. Sec. 841(a)(1), and Sec. 846, including:

    a. lists of contacts and related identifying information;

    b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    c. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information

    d. all bank records, checks, credit card bills, account information, and other financial records, or other records indicating attribution;

    e. all recordings both audio and visual indicating possession, storage, or trafficking (to include exif data associated with visual recordings which can provide evidentiary dates and locations associated with the recordings);

    f. all communications to include but not limited to text or media messages, instant messaging, or messaging applications utilizing the Internet.

2. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. Records evidencing the use of the Internet including:

    a. records of Internet Protocol addresses used;

b.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As the indicated devices can contain removable storage mediums such flash memory or Subscriber Identity Modules, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data).